Good morning. May it please the court, Tim Wilborn for Appellant Patsy Werner. Before I start, there are just so many issues in this case that I wasn't sure if there was a particular issue that the court wanted me to focus on. And so I'll just come right out and ask. Well, I'll just, speaking only for myself, there are many factual errors that the ALJ made that you've pointed out. And to me, the question is whether those errors are harmless and the kind of analysis we have to do. Well, certainly it's my position that they're not harmless. I think the sheer volume of errors is sufficient that it colored the ALJ's perception of the entire case. Because he was under the mistaken impression that this claimant essentially was living under completely different circumstances than what she really is. I kind of beat that issue to death in my opening brief and skimmed over it just lightly in the reply. But I think that if you look at the cumulative effect of those errors, no adjudicator could believe all those wrong things that this ALJ believed and still view the case in the same light that they would view the case in the absence of those errors. So I don't think they're harmless. I'll follow up on that. As Judge Graber put it, there are lots and lots of errors here. If you assume, just for purposes of our argument today, that they were harmless errors. Okay. As to any case law or any agency ruling that would suggest that when the number of errors, albeit harmless, gets to a certain level, that there is cumulative effect requires a reversal. Is there any case law to that effect? I wish I had some case law to that effect because, you know, it seems like five errors should be enough or six. And we have that here. And these are not small errors either. Granted, any one of these errors in isolation might be harmless. Although I think there are some errors that even in isolation are not harmless. And can you give us an example of an error that you believe under there's just no possibility of harmless error here? Yes. Okay. Could you do that? The irritable bowel syndrome issue. ALJ erroneously believed that no doctor had prescribed medication to treat this. He also erroneously believed that the impairment had not lasted the requisite 12 months as is required under the Social Security Act. When you look, and unfortunately I don't have this marked, but if you look at my brief, and I'll see if I can find it. Here it is. Pages 46 and 7 of my opening brief. He was mistaken on all these issues because the medical record documents diarrhea and irritable bowel syndrome and hyperactive bowel. They use various different terms throughout the record, but they keep coming back to it. And the claimant gave testimony at the hearing about what the effects of this irritable bowel syndrome were, and the administrative law judge conceded that if he believed it, that would alone support a finding of disability. I thought, though, counsel, that in that instance, that although there had been a recent deterioration, as I understand it from my notes, that she claimed to have had four accidents every month rather than once or twice a year, but that it had not persisted for the requisite 12-month period. Is that wrong? It's wrong in the sense that she had irritable bowel syndrome for the requisite 12-month period. What she did not have is a level of severity of irritable bowel syndrome that was consistent all the way through the record. You're saying that the level was inconsistent, but it did go past 12 months, and the record substantiates that. Absolutely. And I put you on the spot, but do you know where in the record I could look to corroborate that? Well, we have the discussion here on pages 46 and 47 of my brief. We have when she went to see Dr. Wood, the consultative. On page 46, 47, do you cite through the record something that we could look at that would corroborate the 12-month period? Well, it starts in 1997 and goes through at least 2002, so that's more than 12 months. And there was no stopping during that entire period? Is that what the record shows? Well, the record doesn't document the irritable bowel syndrome on each day through there, but I think it's consistent. The underlying medical record is consistent with the testimony that the condition existed. I mean, when she went to see Dr. Wood, for example, she told him that she hadn't eaten since the night before because she can't go out in public after she's eaten. She will have an accident. She told the administrative law judge at the hearing the same thing, that I haven't eaten today because I would have an accident if I did. All this is consistent. I see in the record, for example, two records for purchases of Lomatil prescribed by Dr. Gundry. One is dated January. This is the 2013 ER tool, and I'm looking for 209 and 210. Here it is up here. Okay, so 209 and 210. I just want to make sure I understand. I believe this is only one piece of evidence, but is this in here? Are those proffered to show that these records of prescriptions Lomatil show a duration, or just the fact that one's dated 2000 to 2002? One is March 2000, and then the other one is June 2000. What's the import of these? You said that she had the diagnosis of IBS, but not the severity for 12 months, as I understand what you said. I said that the diagnosis was established longitudinally. I said the severity is not established longitudinally necessarily by the medical records, but that the existence of the condition is, and what is established, what does establish the severity of it is her testimony, and there is no reason to disbelieve her testimony on this point. It's corroborated by all the evidence that I mentioned, the lay testimony, the fact that she didn't eat before, you know, all these appearances that she came. The significance, as I understand it, of the excerpts that Judge Fisher was pointing to is that the ALJ mistakenly said that she did not receive prescription medication for this condition at all. Precisely. Those two prescriptions. I believe it is reversible error on that point alone. If I may, I would like to reserve my final minute. You may. We'll hear from Mr. Bloom. Good morning. May it please the Court. David Bloom for the Commissioner of Social Security. I'll just start right in with the irritable bowel syndrome topic, because you were talking about that. The ALJ, right after he said that the plaintiff did not receive any medication for the condition, did acknowledge that she testified that she used over-the-counter, as he called it, Lomatil. So he was aware that she was taking some medication for that condition. That's on page A63. The significance of this issue is that even if she was taking medication, but Lomatil isn't over-the-counter. That's what I was trying to understand. It says it's identified to Gundry, so I wasn't sure Lomatil was, let's say, over-the-counter. Why would it show up in the record that Gundry's name is there? I saw that Dr. Gundry did prescribe that, but as I recall, she also testified that she purchased it over-the-counter. Well, is Lomatil or is it not a controlled substance? It's a controlled substance. So she couldn't have purchased it over-the-counter. She may have been mistaken then. Or perhaps, since this is Oregon, there might be people that use controlled substances without prescription. We have some in California, too. I don't know. Not Lomatil. Good point. Not one of the more exciting abusable drugs. But, you know, there are some errors that are undeniable. I mean, he took SL slightly to mean SI, suicidal ideation, which is just completely out there somewhere. And he misunderstood how often she saw her sister. And there were just many factual errors. And, you know, each one alone, I don't know what to make of it, but it is a bit disturbing. It just seems that the ALJ didn't do a very careful job. And I don't know if that means reverse, but that's what I would like for you to talk to me about. Sure. I mean, that's an interesting point. And, of course, it's a difficult one for me to be here to talk about. But I was thinking about your question, Judge Smith. Is there some kind of theoretical limit on the number of harmless errors? And my first answer defending a commissioner would be no, that if an error is harmless, that it doesn't matter how many there are. I think there could be exceptions to that. If an ALJ gave four credibility reasons and each one was an error, then you couldn't say, well, they are all harmless and nothing matters because there wouldn't be any valid reasons left. But here, the errors taken in isolation, even cumulatively, were harmless as a whole because they weren't central to the ALJ's reasoning, to the main theme of the case. And that is that there's simply not enough objective medical findings or evidence to support plaintiff's disability claim. For instance, Dr. Douglas' opinion, that's a central issue in the case. And the ALJ made that mistaken reference to SL abbreviation and also talked about the sister visits. But the main reason that he rejected Dr. Douglas' opinion was that the mental status examination results that Dr. Douglas noted throughout his visit simply didn't correspond with disability. And also, Dr. Wood's opinion contradicted Dr. Douglas' opinion. So he gives other reasons that... Counsel, I respect what you're saying and I'm inclined to agree that you can explain it that way. But we live in a system where the judiciary or, in this case, the ALJ and the system doesn't have the respect of people who use its services. And ultimately, it's a way at the credibility and dependability of the system. And I guess following up on my earlier question, I would ask you, even from a, I don't know what you'd call it, the perception of justice concept, don't we have to be sensitive to the fact that even if harmless, if you get a sufficient quantum of errors, there are obvious errors in a proceeding of this nature that we need to be cognizant of that and in order to make certain that there is an appearance as well as an actuality of justice, that there may be some point at which you say, you know, we really need a fresh start at this. We need to take a look at it again. Does that make sense to you? It does. I mean, and Social Security Administration cares about the perception of the claimants and the public. So, yes, I agree with you that that is important. How would we cabin that concept? I'm not saying, I mean, obviously there are various ways to deal with something like this, but if somebody were trying to cabin that concept, how would you define it? How could you help us with that concept? Well, I know this Court has been in somewhat of a tussle about the whole harmless error issue, but I would think that even under, I'll call it the more stringent test that I know Judge Graber, you've written about, if you look at whether the errors as a whole really affected the ALJ's reasoning, central reasoning or outcome of the decision, that's the main thing that you look at. Well, the concern is, I guess, if there are enough mistakes that are obviously mistakes, whether it casts doubt on the reasonableness of the entire proceeding. I'm just echoing what Judge Smith has said. And it's different to ask the commissioner to do it again versus paying benefits. I mean, those are two very different things. And I think at least what I understood Judge Smith to be saying is maybe a do-over when it's apparent that there are numerous mistakes that might or might not affect the outcome if the mistakes had not been made. If we can't be sure, what should we do? Yeah, well, I don't have authority to agree to a certain amount of error per page. 4.7. We may be able to give you cover on that. I'd zero in, though, on the objective side, which was, if I can understand that argument, that was my own reaction as to why this case is a close case. So it seems to me the one that counsel focused on, the continents, the accidents, that's where I was looking. I thought at some point the ALJ said, I will stipulate that if somebody has four accidents, whatever, they wouldn't be able to work with that kind of situation. But then he talked about the duration. And I'm trying to, is it objectively medically possible that if the ALJ got properly focused on this particular aspect of her disability, that being corrected as to what she was doing for treatment of it, the fact that, zeroing in on the fact that it was corroboration, she did have these heating problems and they could cause the problem, that there is at least some objective medical condition here that would be disabling. The ALJ itself is correcting that. I don't concede that IBS, the initials for it, was established objectively. She testified herself that she had undergone several diagnostic tests for IBS and all of them were normal. And Mr. Wilborn mentioned that the severity of the symptoms here really depends upon her subjective report. There is some lay witness corroboration of that, but they're depending on her reports as well. Part of what the ALJ relied on in finding IBS non-severe was that her reports of, even her reports of accidents wasn't consistent, uniform throughout the time period at issue. And under the Supreme Court case, Barnhart v. Walton, you don't need just an impairment for 12 months for it to be severe. It has to be significantly limiting for 12 consecutive months to meet the duration requirement. So the record didn't show, even by her subjective reports, that it remained at sufficient level of severity to meet that 12-month requirement. And in addition, the objective confirmation of the condition is just simply not there in the medical records. She reports it occasionally to doctors, but she doesn't report severity of accidents frequently. And there was no diagnostic testing done by any of the doctors that confirmed she actually had the condition. Are there any other questions that the panel has? I believe so. Thank you. Thanks very much. Mr. Reilborn, you have some time left. On this issue of whether these errors cumulatively are harmless or not, there's one way to find out. Send it back to the ALJ with instructions to reconsider it in light of these errors being pointed out to the ALJ. Let me explain why that's critical. Because at the ALJ level, the standard, the burden of proof, is a mere preponderance. And I think if you take all these errors out, the scales tip that much to where she has met her preponderance burden. With these multiple errors in, the scales were tipped the other direction in the ALJ's mind. Now, on review, this court reviews for substantial evidence, which is a completely different standard, a burden of proof. And I think that you have to consider that back at the ALJ stage, it takes far less to win than it does here. And so when you add up all these errors, the ALJ really is the one who needs to reconsider this, not this court. Thank you, counsel. Thank you. We appreciate the arguments of both counsel. They've been very helpful. The case just argued is submitted. Door Guard v. United States came off the calendar and is not subject to argument. Which brings us to Stocki v. Astru. Just for planning purposes, we'll hear this case and one more and then we'll take a mid-morning break. So, Mr. Lowery, whenever you're ready.
judges: Graber, Fisher, Smith